IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| LEONARD MORNES, § | |
|     PLAINTIFF, § | |
| § | |
| V. § | CASE NO. 17-CV-2333-N-BK |
| § | |
| SHERIFF LUPE VALDEZ, SHIFT § | |
| LEADER OFFICER NFN SMITH, § | |
| OFFICER NFN SMITH, NURSE § | |
| ELIZABETH NLN, DR. NFN BETT, § | |
| DR. SEAN NICHOLAS SHAHRESTANI, § | |
|     DEFENDANTS. § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE**

Pursuant to 28 U.S.C. § 636(b) and *Special Order 3*, this case has been referred to the United States magistrate judge for pretrial management. The Court now considers Defendants' motions for summary judgment. Doc. 90; Doc. 102; Doc. 123. For the reasons detailed herein, the motions should be **GRANTED**.

**I.     BACKGROUND**

Plaintiff, a *pro se* prisoner, filed this case in September 2017, pursuant to 42 U.S.C. § 1983, alleging that he suffered cruel and usual punishment when he was denied prompt treatment for two broken bones near his ankle. Doc. 3 at 3; Doc. 9 at 3. He named as Defendants then-Sheriff Lupe Valdez, two Dallas County Jail officers, and a number of health care providers. All Defendants have filed summary judgment motions, which are now are ripe for adjudication.

## II.   APPLICABLE LAW

### A.   Summary Judgment Standard

Summary judgment shall be granted when the record shows that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law.   FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986).   A dispute regarding a material fact is "genuine if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party."   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).   When ruling on a motion for summary judgment, the court is required to view all facts and inferences in the light most favorable to the nonmoving party and resolve all disputed facts in favor of the nonmoving party.   *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005).   Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence showing the existence of a genuine dispute of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986).   "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."   *Id.* at 587.

### B.   Section 1983 and Qualified Immunity

Section 1983 "provides a federal cause of action for the deprivation, under color of law, of a citizen's 'rights, privileges, or immunities secured by the Constitution and laws' of the United States."   *Livadas v. Bradshaw*, 512 U.S. 107, 132 (1994).   To state a claim under section 1983, a plaintiff must allege facts that show that he has been deprived of a right secured

by the Constitution and the laws of the United States, and the defendants were acting under color of state law.  *See Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 155 (1978).

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (citation omitted).  The qualified immunity inquiry involves two prongs that the Court must answer affirmatively before an official is subject to liability: (1) do the facts that the plaintiff has alleged make out a violation of a constitutional right; and (2) was the right at issue "clearly established" at the time of the defendant's alleged misconduct?  *Id.* at 232.  A court may begin its assessment with either prong.  *Id.* at 236 (*overruling in part Saucier v. Katz*, 533 U.S. 194 (2001)).

    C.   *Constitutional Right to Medical Care*

A state's exercise of its power to hold pretrial detainees and prisoners brings with it a constitutional responsibility to tend to the essentials of their well-being, including by providing for their medical needs.  *Hare v. City of Corinth, Miss.*, 74 F.3d 633, 639 (5th Cir. 1996) (en banc).  Prison inmates derive their right to have these basic needs met from the Eighth Amendment's prohibition against cruel and unusual punishment.  *Id.*  As such, an inmate has a clearly established constitutional right not to be denied, by deliberate indifference, attention to his serious medical needs.  *Id.* at 650.  Pretrial detainees derive their right to be free from cruel and unusual punishment from the Fourteenth Amendment, and the same deliberate indifference standard applies.  *Id.* at 639, 647-48.

But deliberate indifference is "an extremely high standard."  *Domino v. Tex. Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001).  The prisoner/detainee must prove: (1) the

3

existence of a serious medical need; (2) that prison officials had subjective knowledge of the substantial risk of serious harm caused by the need; (3) that prison officials, despite their actual knowledge of the substantial risk, denied or delayed the prisoner's medical treatment; and (4) the delay in or denial of medical treatment resulted in substantial harm, such as suffering additional pain. *Petzold v. Rostollan*, 946 F.3d 242, 249 (5th Cir. 2019) (citations omitted). Importantly, "disagreement about the recommended medical treatment is generally not sufficient to show deliberate indifference." *Carlucci v. Chapa*, 884 F.3d 534, 538 (5th Cir. 2018).

## III. FACTUAL SUPPORT FOR SUMMARY JUDGMENT MOTIONS

In Plaintiff's operative complaint, which he filed under penalty of perjury, he alleges the following: While he was a pretrial detainee at the Dallas County Jail (the "Jail"), Defendant "Dr. Betts" changed one of his prescription medications to Thorazine against his wishes.[1]  Doc. 85 at 3. On October 27, 2015, when Plaintiff stood up from using the toilet in his cell, the medication caused him to black out and fall, and he awoke with severe pain near the bottom of his right leg and could not walk. Doc. 85 at 6.

Detention Training Officer Smith ("DTO Smith"), Detention Services Officer Smith ("DSO Smith"), and a "Jane Doe" known to Plaintiff only as "Nurse Elizabeth" came to his cell and made fun of him. Doc. 85 at 3, 6. DTO Smith told Plaintiff that she would come back to take him to the doctor but did not return. Doc. 85 at 6. On October 29, 2015, Plaintiff was taken by wheelchair to the physician at the Jail who told him that his injury was only a sprain. Doc. 85 at 3, 6-7. Plaintiff insisted on getting an x-ray, and on October 30, 2015, he was taken

---

[1] Defendant Linda Bett is actually a family psychiatric nurse practitioner. Doc. 58 at 5 (Bett Affid.). The Court will refer to her as "NP Bett."

to Parkland Hospital ("Parkland") where an x-ray revealed that his leg was broken in two places and he was told that he needed surgery. Doc. 85 at 7. Plaintiff also alleges that the doctors at Parkland delayed the procedure for several days, however, and just wrapped his leg without setting it or giving him any pain medication. Doc. 85 at 4, 7. Plaintiff asserts that he was not given pain medication until the day of surgery, performed a week later on November 6, 2015. Doc. 85 at 7.

In support of their motions, Defendants have submitted documents demonstrating the following: On the morning of the incident in question, DTO Smith responded to Plaintiff's cell upon learning that an inmate had fallen, and she filed the resulting incident report. Doc. 61-1 at 2 (DTO Smith Affid.). The incident report reflects that DTO Smith radioed for assistance and Nurse John Watts responded, but Plaintiff would not allow Nurse Watts to examine him and refused to go to the nursing station in a wheelchair that was brought for him. Doc. 61-1 at 3 (DTO Smith Affid.); Doc. 61-5 at 29 (Incident Report). There is no record of Plaintiff being seen by a nurse named Elizabeth on the day he fell. Defendant Adunni Yakubu, LVN, attests that she is called Elizabeth, which is the name she was given when she was baptized, but she was not working on the day of the incident. Doc. 125 at 35, 38 (Yakubu Affid.).

Defendant Lupe Valdez ("Valdez") states in her affidavit that she was not aware of Plaintiff's presence in the Jail and had no contact with him. Doc. 61-3 at 1. Additionally, Defendant Valdez sets forth in detail the Jail's training and policies governing the care of detainees' medical needs and attaches to her affidavit the Dallas County Sheriff Department's Standard Operating Procedures governing health services. Doc. 61-3 at 2-4 (Valdez Affid.); Doc. 61-5 at 4-28 (SOP).

Plaintiff's medical records reflect that on the day of his fall, he reported to a nurse at the

5

Jail that he had twisted his ankle, and his pain was five on a ten-point scale, but there was no "obvious extremity deformity." Doc. 61-6 at 13-14 (Jail Med. Rec.). The nurse noted that she was referring Plaintiff to a medical provider for further evaluation and he should return to the clinic as needed. Doc. 61-6 at 15 (Jail Med. Rec.). On the next day, October 28, 2015, Plaintiff was examined by a doctor at the Jail who observed that his ankle was swollen and had decreased range of motion. Doc. 61-6 at 22 (Jail Med. Rec.). The doctor diagnosed right ankle sprain and prescribed Plaintiff 600 mg of ibuprofen to be taken twice a day until November 26, 2015. Doc. 61-6 at 23 (Jail Med. Rec.). Additionally, the doctor gave Plaintiff an Ace wrap and ordered an x-ray. Doc. 61-6 at 23 (Jail Med. Rec.). The following day, Plaintiff's ankle was x-rayed and revealed bone fractures. Doc. 61-6 at 27 (Jail Med. Rec.). On October 30, 2015, the doctor at the Jail advised Plaintiff of this and sent him to Parkland's emergency department. Doc. 61-6 at 29-30 (Jail Med. Rec.).

Upon arrival, Plaintiff underwent several additional imaging studies, after which Defendant Dr. Sean Shahrestani, M.D., a second-year orthopedic resident, arrived to see Plaintiff. Doc. 125 at 6 (Shah. Affid.). In his supporting affidavit, Dr. Shahrestani asserts that after both he and his attending faculty supervisor, Dr. Brigham Kanakanuiokekai Au, M.D., had reviewed Plaintiff's x-rays and examined him, they formulated a plan of care. Doc. 125 at 10-11 (Shah. Affid.); Doc. 125 at 21 (Parkland Med. Rec.). Pursuant to that plan, Dr. Shahrestani performed an initial reduction/realignment of Plaintiff's fractures and applied a short "Ortho-Glass" and cotton padding splint to his leg. Doc. 125 at 7, 10-11 (Shah. Affid.); Doc. 125 at 24 (Parkland Med. Rec.). Dr. Shahrestani further avers that he and Dr. Au confirmed by post-reduction x-rays that the bones were well-aligned and that there was no neurovascular compromise. Doc. 125 at 8 (Shah. Affid.).

6

From there, the treatment plan was to call Plaintiff back for surgery the following week once the soft tissue swelling in his leg had subsided, which is standard procedure in such closed fracture cases. Doc. 125 at 8, 12 (Shah. Affid.). Dr. Shah affirmed that because Plaintiff's orthopedic services were concluded, his care (including any need for pain medication) was left to the emergency department, which discharged him. Doc. 61-7 at 5, 8 (Parkland Med. Rec.); Doc. 125 at 8-9 (Shah. Affid.). Plaintiff was returned to the Jail the same day. Doc. 61-6 at 49 (Jail Med. Rec.).

The following day, October 31, Plaintiff went to the Jail clinic for an assessment, where his treatment plan was discussed, and Plaintiff was continued on the same medications. Doc. 61-6 at 38-40 (Jail Med. Rec.). On November 2, 2015, Plaintiff was referred for surgery, which was scheduled for the following day, but his appointment had to be moved to November 6 due to transportation issues. Doc. 61-6 at 44, 49 (Jail Med. Rec.). On November 6, 2015, Dr. Au performed Plaintiff's outpatient surgery with the assistance of a different resident, after which Plaintiff was returned to the Jail, admitted into the infirmary for recovery, and given pain medication. Doc. 61-6 at 49, 51-53 (Jail Med. Rec.); Doc. 125 at 32 (Parkland Med. Rec.). The day after Plaintiff's surgery, he refused to get up from bed to go to the Jail clinic and denied having any complaints. Doc. 61-6 at 62 (Jail Med. Rec.).

On January 10, 2016, Plaintiff filed a grievance against, *inter alia*, DTO Smith and DSO Smith, complaining that he was denied treatment for his broken leg from October 27 through November 6, 2015. Doc. 61-3 at 7 (Valdez Affid.); Doc. 61-4 at 14 (Grievance Form). In response to his grievance, Jail medical staff prepared a timeline of the care Plaintiff had requested and received. Doc. 61-3 at 8 (Valdez Affid.); Doc. 61-4 at 16 (Timeline). The Inmate Grievance Committee denied Plaintiff's grievance on January 26, 2016, and Plaintiff did

7

not file an appeal to the Detentions Service Manager, Quality Assurance Unit; thus, he did not exhaust his administrative remedies prior to filing this suit. Doc. 61-3 at 6-9 (Valdez Affid.); Doc. 61-4 at 17 (Denial Form).

## IV. ARGUMENTS AND ANALYSIS

### A. NP Bett

The sum of Plaintiff's complaint as to NP Bett is that she acted with deliberate indifference to his medical needs when she changed his medication to Thorazine against his wishes, and the medication caused him to black out and fall. Doc. 85 at 3, 6. Although NP Bett asserts qualified immunity in her summary judgment motion, the gist of her defense is that "this appears to be a case of mistaken identity." Doc. 91 at 8. Indeed, NP Bett points to Jail medical records showing that she only saw Plaintiff one time before his injury, and she was not the practitioner who prescribed Thorazine for him. Doc. 91 at 14.

A review of the records reflects that on October 14, 2015, a physician assistant named Catherine Judd started Plaintiff on Thorazine (Chlorpromazine).[2] Doc. 61-6 at 8-9 (Jail Med. Rec.). The records further indicate that the only time NP Bett treated Plaintiff before his injury on October 27, 2015 was more than a month prior, and he was not on Thorazine then nor did she prescribe it. Doc. 58 at 9 (Bett Affid); Doc. 58 at 20-25 (Jail Med. Rec.). Plainly, NP Bett is not responsible for Judd's actions. She is thus entitled to summary judgment based on qualified immunity because she undertook no action which could have violated Plaintiff's constitutional rights. *Pearson*, 555 U.S. at 232. Plaintiff's claim against NP Bett should be dismissed with

---

[2] The undersigned recently denied Plaintiff's motion to amend, in which he sought to add Judd to this action, as untimely and futile. Doc. 108.

prejudice.

### B.   The County Defendants — Valdez, DTO Smith, and DSO Smith

Valdez, DTO Smith, and DSO Smith (collectively "the County Defendants") move for summary judgment on Plaintiff's claims based on (1) his failure to exhaust administrative remedies as required by the Prison Litigation Reform Act ("PLRA"); and (2) their qualified immunity from suit.   Doc. 103 at 8.   In his response, Plaintiff addresses the County Defendants' assertion of qualified immunity, but does not discuss their argument that he did not comply with the PLRA.   Doc. 113 at 1-2.   Because the County Defendants' first argument is dispositive, the Court need only address that one.

Under the PLRA, "[n]o action shall be brought with respect to prison conditions under section 1983 . . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."   42 U.S.C. § 1997e(a); *see Woodford v. Ngo*, 548 U.S. 81, 84 (2006).   "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules."   *Woodford*, 548 U.S. at 90.   The prisoner has to have "pursue[d] the grievance remedy to conclusion" — substantial compliance with administrative procedures is not enough.   *Bargher v. White*, 928 F.3d 439, 447 (5th Cir. 2019) (quoting *Wright v. Hollingsworth*, 260 F.3d 357, 358 (5th Cir. 2001)).   Failure to exhaust administrative remedies under the PLRA is an affirmative defense.   *Jones v. Bock*, 549 U.S. 199, 216 (2007).   The defendant thus bears the burden on summary judgment to establish that a prisoner did not make use of the available administrative remedies.   *See Crescent Towing & Salvage Co., Inc. v. M/V Anax*, 40 F.3d 741, 744 (5th Cir. 1994) (affirmative defense requires the movant on summary judgment to establish each element of defense as a matter of law) (citation omitted).

9

To satisfy their burden, the County Defendants present the grievance Plaintiff filed on January 10, 2016 about the course of events from October 27 through November 6, 2015. Doc. 61-4 at 14 (Grievance Form). By way of Valdez's affidavit, the County Defendants aver that Plaintiff did not file an appeal after his grievance was denied. Doc. 61-3 at 6-9 (Valdez Affid.); Doc. 61-4 at 17 (Denial Form). They have therefore met their initial summary judgment burden to show that there is no genuine issue of material fact that Plaintiff failed to exhaust his administrative remedies. *Celotex Corp.*, 477 U.S. at 323-25.

The burden now shifts to Plaintiff to point to evidence in the record sufficient to establish a material disputed fact as to that issue. *Id.* Plaintiff did not address the County's exhaustion argument in his response brief, however. Accordingly, he has waived any argument he may have had regarding exhaustion.[3] *See Keenan v. Tejeda*, 290 F. 3d 252, 262 (5th Cir. 2002) ("If a party fails to assert a legal reason why summary judgment should not be granted, that ground is waived.") (quotation omitted). Plaintiff's claims against the County Defendants should thus be dismissed without prejudice due to his failure to exhaust his administrative remedies under the PLRA. *See Bargher*, 928 F.3d at 447 (holding that dismissal for failure to comply with PLRA's exhaustion requirement should be without prejudice).

---

[3] Plaintiff impermissibly filed two sur-replies to the County Defendants' summary judgment motion without leave of Court, Doc. 121 & Doc. 122, which they and NP Bett have moved to strike, Doc. 128 & Doc. 129. On review, the filings do not assist Plaintiff's case. In a brief reference to the exhaustion issue, Plaintiff alleges that the Jail's grievance coordinator misled him about his ability to appeal the denial of his grievance, and he never received a Jail handbook. Doc. 122 at 4. The record, however, reflects that Plaintiff received a copy of the Jail handbook, as all detainees do, and the handbook explains the grievance procedure. *See* Doc. 61-3 at 6 (Valdez Affid.); Doc. 61-4 at 12 (Handbook); Doc. 61-5 at 35 (Plaintiff's signature card).

C.  *Nurse Yakubu*[4]

Plaintiff's allegations against the individual he refers to as "Nurse Elizabeth" are that she laughed at him, said there was nothing wrong with him, told him he could walk to see the doctor, and denied him medical attention for three days in violation of her oath as a nurse. Doc. 85 at 3. Initially, Plaintiff questioned whether — and now denies that — Nurse Yakubu is "Nurse Elizabeth." Doc. 136 at 8. Be that as it may, the actions of which Plaintiff complains simply do not rise to the level of deliberate indifference that could overcome a qualified immunity defense.

A prison official acts with deliberate indifference only if she both (1) "knows that inmates face a substantial risk of serious harm" and (2) "disregards that risk by failing to take reasonable measures to abate it." *Jones v. Tx. Dep't of Criminal Justice*, 880 F.3d 756, 759 (5th Cir. 2018) (quoting *Farmer v. Brennan*, 511 U.S. 825, 847 (1994)). To prove the second element, a plaintiff must show that the prison official "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Id.* (quoting *Domino*, 239 F.3d at 755). "[D]eliberate indifference cannot be inferred merely from a negligent or even a grossly negligent response to a substantial risk of serious harm." *Thompson v. Upshur County*, 245 F.3d 447, 459 (5th Cir. 2001) (citing *Hare v. City of Corinth*, 74 F.3d 633, 645, 649 (5th Cir. 1996) (en banc)). Finally, while rude or insensitive behavior towards inmates is unacceptable, it does not in and of itself rise to the level of deliberate indifference. *Atkins v. Lofton*, 373 Fed.

---

[4] Plaintiff also impermissibly filed two sur-replies to Defendant Yakubu and Shahrestani's summary judgment motion, Doc. 139 & Doc. 141, which those Defendants have moved to strike, Doc. 140 & Doc. 142. Again, a review of Plaintiff's filings adds nothing of substance to the analysis herein.

App'x 472, 473 n.1 (5th Cir. 2010).

Taking Plaintiff's most serious allegation first, he attested in his sworn complaint that Nurse Elizabeth denied him medical attention for his broken leg for three days and said there was nothing wrong with him.  Doc. 85 at 3.  This allegation is strikingly similar to the fact pattern in *Petzold*, 946 F.3d at 242.  There, inmate Petzold approached a prison nurse Rostollan about severe ankle pain and Nurse Rostollan, without looking at Petzold's ankle, told him to ice it and buy some pain medication even though the commissary was closed.  *Id.* at 246.  It was not until three days later that Petzold was treated by a different nurse, and x-rays revealed that his ankle was fractured.  *Id*.  Petzold filed suit alleging, *inter alia*, that Nurse Rostollan had acted with deliberate indifference to his serious medical needs.  *Id.* at 247.  The district court granted summary judgment, however, holding that no reasonable jury could find that Nurse Rostollan "had actual knowledge of Petzold's fractured bone, an atypical injury, from his limited encounter and correspondingly truncated knowledge."  *Id.* at 250.

The same holds true in this case.  Based on the way Plaintiff describes his brief encounter with the nurse in question, there is no genuine issue of material fact as to whether she could have had actual knowledge of Plaintiff's fractured leg.  Moreover, the Jail's medical records indicate that Plaintiff was treated much sooner by other medical personnel than was defendant Petzold, such that there was very little delay in his treatment.  *See id.* at 246; Doc. 61-6 at 13-14 (Jail Med. Rec.).  Plaintiff saw a different Jail nurse on the day of his fall, reported only moderate pain, and was examined by a doctor the next day.  Doc. 61-6 at 13-14, 22 (Jail Med. Rec.).  The doctor prescribed Plaintiff 600 mg of ibuprofen, gave him an Ace wrap, and ordered an x-ray, which was completed the next day.  Doc. 61-6 at 23, 27 (Jail Med. Rec.).  The day after that, the doctor advised Plaintiff of the x-ray results and sent him to Parkland's

emergency department.   Doc. 61-6 at 27, 29-30 (Jail Med. Rec.).

While Plaintiff denies this timeline and asserts that his medical records have been altered to fit Defendants' narrative, there is simply no evidence to suggest that and Plaintiff's conclusory statements are not enough to create a genuine issue of material fact on that point.  *See Knighten v. Ott*, 69 Fed. App'x 657 at *1 (5th Cir. 2003) (citation omitted) (holding that conclusory allegations that medical records have been "falsified" are insufficient to defeat a motion for summary judgment); *Mathis v. Alexander*, 49 F.3d 728, 1995 WL 103646, at *4 (5th Cir. March 3, 1995) (holding that plaintiff's conclusory allegation that prison and medical records were falsified lacked merit and dismissal of deliberate indifference claim was appropriate).   The balance of Plaintiff's complaints against the nurse in question would fare no better.   Any rudeness or lack of compassion she may have exhibited would not constitute a violation of the Eighth or Fourteenth Amendments.  *Atkins*, 373 Fed. App'x at 473 n.1.   Finally, if Nurse Yakubu is not, as Plaintiff now insists, the "Nurse Elizabeth" to whom he was referring, she is entitled to dismissal of Plaintiff's deliberate indifference claim against her with prejudice for the same reasons as is NP Bett.   *See supra* part IV.A.

    D.    *Dr. Shahrestani*

Dr. Shahrestani asserts that he is entitled to qualified immunity because the evidence demonstrates that he did not violate Plaintiff's clearly established right to be free from deliberate indifference and his conduct was not objectively unreasonable since he fulfilled his professional duties in good faith and within the standard of care.   Doc. 124 at 17-18, 22-23.

The gist of Plaintiff's complaint against Dr. Shahrestani is that the doctor: (1) put his leg in a splint and wrapped it without setting the bones; (2) sent him back to Jail without pain medication; and (3) delayed his surgery for a week, which caused him unnecessary suffering.

13

Doc. 85 at 4, 7.   Plaintiff suggests in his response to Dr. Shahrestani's motion that Dr. Shahrestani and Dr. Au acted with deliberate indifference by leading him to believe that his surgery was going to be performed the day he went to Parkland for his x-rays, but then sending him back to the Jail with no pain medication instead.   Doc. 136 at 7, 9.

Plaintiff has not presented sufficient evidence to overcome Dr. Shahrestani's qualified immunity defense.   The evidence of record reflects that Dr. Shahrestani and Dr. Au both reviewed Plaintiff's x-rays and examined him to develop a plan of care, which they discussed with him before obtaining his written consent to perform surgery.   While there may have been some confusion on Plaintiff's part that he was getting surgery immediately, Dr. Shahrestani avers that is not what he and Dr. Au recommended to Plaintiff, and it "would not have been in his best interest" because "it is not advisable to perform an open reduction of the bones and apply internal fixation hardware until the swelling subsides."   Doc. 125 at 11 (Shah. Affid.).   Dr. Shahrestani averred that holding off on the surgery for that purpose was "appropriate" and "standard procedure" in cases such as Plaintiff's, "and is not in any respect an unnecessary delay."   Doc. 125 at 8, 12 (Shah. Affid.).   Because Plaintiff had been admitted through Parkland's emergency department, he was returned there for discharge following the realignment and splinting procedure, which is where orders or recommendations for medication would have been given.   Doc. 125 at 8-9 (Shah. Affid.).

There is no controverting evidence in the record, and Plaintiff offers only his speculation and disagreement with Dr. Shahrestani's course of treatment.   On these facts, Plaintiff cannot show that Dr. Shahrestani "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs."   *Domino*, 239 F.3d at 755.   Plaintiff's disagreement with the way

14

Dr. Shahrestani rendered care is not enough to show deliberate indifference in this case. *Carlucci*, 884 F.3d at 538. Accordingly, Dr. Shahrestani is entitled to summary judgment, and the claims against him should be dismissed with prejudice.

## IV.  CONCLUSION

For the foregoing reasons, the County Defendants' *Renewed Motion for Summary Judgment*, Doc. 102, should be **GRANTED** and the claims against them should be **DISMISSED WITHOUT PREJUDICE**. NP Bett's *Second Motion for Summary Judgment*, Doc. 90, and *Motion for Summary Judgment of Defendants Sean Shahrestani, MD and Adunni Yakubu, LVN*, should also be **GRANTED** and the claims against them should be **DISMISSED WITH PREJUDICE**. Because no outstanding claims will remain,[5] this case should then be **CLOSED**.

**SO RECOMMENDED** on April 30, 2020.

_____
RENEE HARRIS TOLIVER
UNITED STATES MAGISTRATE JUDGE

---

[5] Although process issued for Dr. Au, it was returned unexecuted. Doc. 138. Regardless, Dr. Au would be entitled to qualified immunity for the same reasons as is Dr. Shahrestani. *See Baughman v. Hickman*, 935 F.3d 302, 306 (5th Cir. 2019) (evaluating section 1983 claims against unserved defendants under the PLRA).

**INSTRUCTIONS FOR SERVICE AND
NOTICE OF RIGHT TO APPEAL/OBJECT**

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law.  Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy.  *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b).  An objection must identify the finding or recommendation to which objection is made, the basis for the objection, and the place in the magistrate judge's findings, conclusions and recommendation the disputed determination is found.  An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific.  Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error.  *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).